MELINDA HAAG (CSBN 132612)
United States Attorney
ALEX G. TSE (CSBN 152348)
Chief, Civil Division
GIOCONDA MOLINARI (CSBN 177726)
Assistant United States Attorney
    450 Golden Gate Avenue
    San Francisco, CA 94102-3495
    Telephone: (415) 436-7220
    Fax: (415) 436-6748
    Email: gioconda.molinari@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE ARBA GROUP; CF WATSONVILLE EAST, LLC; CF WATSONVILLE WEST, LLC; COUNTRY VILLA HEALTH SERVICE CORPORATION, DBA COUNTRY VILLA HEALTH SERVICES,<br><br>    Defendants.<br>_____ | CASE NO. 14-3946<br><br>UNITED STATES' COMPLAINT<br><br>JURY TRIAL DEMANDED |

    For its Complaint, Plaintiff, the United States of America, alleges as follows:

## **INTRODUCTION**

    1.    Plaintiff brings this action against Defendants the ARBA Group, CF Watsonville East, LLC, CF Watsonville West, LLC, and Country Villa Health Service Corporation, dba Country Villa Health Services, to recover damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-

33 (the "FCA" or "the Act"), and to recover damages and other monetary relief under the common law and equitable theories of payment by mistake and unjust enrichment.

2.      Defendants own, operate and/or manage two nursing home facilities in Watsonville, California (henceforth, the "Facilities"): Country Villa Watsonville East Nursing Center (renamed Watsonville Nursing Center in April 2014), and Country Villa Watsonville West Nursing and Rehabilitation Center (renamed Watsonville Post-Acute Center in April 2014).  The Facilities are licensed by the State of California and participate in the federal Medicare and Medicaid (Medi-Cal) programs.

3.      Between 2007 and 2012, Defendants persistently and severely overmedicated elderly and vulnerable residents of the Facilities (the "Residents"), causing infection, sepsis, malnutrition, dehydration, falls, fractures, pressure ulcers, and for some Residents, premature death.  For these and other reasons, during this period Defendants provided non-existent, grossly inadequate, materially substandard, and/or worthless services to Medicare and Medicaid beneficiaries in violation of Medicare and Medicaid requirements.

4.      Defendants were well informed about the many failures of care at the Facilities.  Top level officials of each of the Defendants received numerous reports from the Facilities' pharmacist about overmedication and other medication failures, as well as notice of lawsuits filed by Residents and their families and complaints filed with California state agencies.

5.      Notwithstanding their knowledge of the numerous failures of care, Defendants submitted, or caused to be submitted, Medicare and Medi-Cal claims for such non-existent, grossly inadequate, materially substandard and/or worthless services, all the while falsely representing and compliance with the Medicare and Medicaid requirements.

6.       Defendants' false or fraudulent statements were material to the decision of the United States Department of Health and Human Services ("HHS") and its operating division, the Centers for Medicare and Medicaid Services' ("CMS"), to make continuing payments to the Facilities for services

UNITED STATES' COMPLAINT

1   provided to Medicare and Medi-Cal beneficiaries.  As a result of Defendants' submission of false or

2   fraudulent claims to the Medicare and Medi-Cal programs, the United States has suffered damages for

3   payments it would not have otherwise made.

4   **JURISDICTION AND VENUE**

5   7.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§

6   1331, 1345, 1367(a) and 31 U.S.C. § 3732.

7   8.    The Court has jurisdiction over Defendants based upon their transaction of business

8   within this judicial district, and pursuant to 31 U.S.C. § 3730 and 31 U.S.C. § 3732(a), permitting suit

9   under the FCA in any judicial district in which a defendant or, in the case of multiple defendants, any

10  one defendant, can be found, resides or transacts business, or in any judicial district in which any act

11  proscribed by 31 U.S.C. § 3729 occurred.

12  9.    Venue is proper in this district under 28 U.S.C. §§ 1391 and 1395(a), and 31 U.S.C. §

13  3732(a), because many of the acts alleged in this complaint occurred in the Northern District of

14  California.

15  **INTRADISTRICT ASSIGNMENT**

16  **(Civil L.R. 3-2(c))**

17  9.    A substantial part of the events or omissions which give rise to the claims herein occurred

18  in Santa Cruz County.

19  **PARTIES**

20  10.   Plaintiff, the United States of America (hereinafter "United States" or "Government"),

21  brings this action on behalf of CMS, for losses the United States incurred under the Medicare and Medi-

22  Cal programs.  At all times relevant to this action, the United States paid approximately 50 percent of

23  the funds Medi-Cal paid to nursing home providers.

24  11.   Defendant the ARBA Group ("ARBA") is and at all times herein mentioned was, a

25  corporation organized and existing under the laws of the State of California with its principal place of

26  UNITED STATES' COMPLAINT

27  3

28

business located in Los Angeles, California.  In 2006, ARBA purchased the real property housing Country Villa Watsonville East Nursing Center ("Country Villa East") and Country Villa Watsonville West Nursing, and Rehabilitation Center ("Country Villa West"), and subsequently established two wholly-owned subsidiaries, CF Watsonville East, LLP and CF Watsonville West, LLP, to operate the respective Facilities.

12.     Defendant CF Watsonville East, LLC ("CFWE") is and at all times herein mentioned was, a limited liability company formed, organized and existing under the laws of the State of California, with its principal place of business located in Los Angeles, California.  In 2007, CFWE was licensed by the Department of Public Health, Licensing and Certification Division of the State of California ("CDPH") to operate Country Villa East as a nursing home.  In 2007, CFWE entered into Medicare provider agreements with CMS to provide nursing home services to Medicare and Medi-Cal beneficiaries under provider number 05-5240.

13.     CF Watsonville West, LLC ("CFWW"), is and at all times herein mentioned was, a limited liability company formed, organized and existing under the laws of the State of California, with its principal place of business located in Los Angeles, California.  In 2007, CFWW was licensed by CDPH to operate Country Villa West as a skilled nursing facility.  In 2007, CFWW entered into Medicare provider agreements with CMS to provide nursing home services to Medicare and Medi-Cal beneficiaries under provider number 05-5959.

14.     At all relevant times, corporate officers of ARBA, including its President (Ira Smedra), its Secretary (Jacob Wintner) and its Chief Operating Officer (Scott Krieger), served in identical or similar capacities as officers of CFWE and CFWW.  Through its officers, ARBA exercised close oversight and control over the finances and operations of the Facilities.

15.     Defendant Country Villa Health Service Corporation, dba Country Villa Health Services ("Health Services"), is and at all times herein mentioned was a corporation formed, organized and existing under the laws of the State of California, with its principal place of business located in Los

Angeles, California.  Health Services owns, operates, and manages healthcare centers in California. From February 1, 2007, through April 1, 2014, Health Services served as management consultant with respect to the operation of the Facilities pursuant to the terms of a "Facility Consulting Agreement" entered into separately with CFWE and CFWW.  Health Services was also CFWE and CFWW's designated Medi-Cal biller from January 2007 to October 2011.

## STATUTORY AND REGULATORY FRAMEWORK

### A.   The False Claims Act

16.    The False Claims Act, 31 U.S.C. §§ 3729 to 3733, as amended by the Fraud Enforcement and Recovery Act of 2009 and the Patient Protection and Affordable Care Act, provides that:

[A]ny person who –

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

***

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410),[1] plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1) (2010).

17.    As relevant to this action, the above provisions of 31 U.S.C. § 3729(a)(1) were substantially the same prior to the 2009 amendments, with the exception of the insertion of the materiality requirement in § 3729(a)(1)(B).

18.    The False Claims Act defines "knowing" and "knowingly" as follows:

---

[1]   Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 (notes), and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to a minimum of $5,500 and a maximum of $11,000 per false claim.

UNITED STATES' COMPLAINT

[T]he terms "knowing" and "knowingly"—

      (A) mean that a person, with respect to information—

            (i)       has actual knowledge of the information;

            (ii)     acts in deliberate ignorance of the truth or falsity of the information; or

            (iii)    acts in reckless disregard of the truth or falsity of the information; and

      (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1) (2010).  Again, this provision was substantially the same prior to the 2009 amendments.

## B.    **Medicare and Medi-Cal**

19.  As part of Title XVIII of the Social Security Act, in 1965 Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395 *et seq.*, known as the Medicare Program, in order to pay for the costs of certain health care services.  Entitlement to Medicare is based on age, disability or affliction with end-stage renal disease.  42 U.S.C. §§ 426, 426-1, 426a, 1395o.  CMS, which administers the Medicare program, has promulgated implementing regulations at 42 C.F.R. § 409 *et seq.*

20.  The Medicaid Program was enacted as part of Title XIX of the Social Security Act.  Medicaid is a joint federal-state program that is administered separately in each of the 50 states and pays healthcare services provided to qualified low-income persons, including aged, blind, or disabled individuals.  42 U.S.C. §§ 1396-1396v.  In California, the Medicaid Program is called "Medi-Cal"  and is administered by the California Department of Health Care Services ("DHCS") and CDPH.  The CMS Medicare regulations at 42 C.F.R. § 409 *et seq.* apply to beneficiaries of both Medicare and Medi-Cal ("dual eligibles").

21.  CMS reimburses nursing home providers for the "reasonable costs" of covered services furnished to Medicare and Medicaid beneficiaries.  *See* 42 U.S.C. §§ 1395x(v)(1)(A), 1395f(b); 42 C.F.R. §§ 413.9(a)-(b).  As a condition of participation in the Medicare and Medicaid programs, providers are required to enter into "Provider Agreements" with the government.  42 U.S.C. § 1395cc.

22.     At all times relevant herein, the Medicare Provider Agreement, Form CMS-1561 (07/01), contain the following certification:  "In order to receive payment under title XVIII of the Social Security Act, [provider name] as the provider of services, agrees to conform to the provisions of 1866 of the Social Security Act and applicable provisions in 42 CFR."  The provider must also certify that it can be subject to criminal penalties if it "knowingly and willfully falsifies" a material fact, or makes any "false, fictitious or fraudulent statement or representation."

23.     On December 14, 2006, Health Services, as a "Biller," and, on January 1, 2007, CFWE and CFWW, as "Provider," executed a Medi-Cal Telecommunications Provider and Biller Application/Agreement (Form 6153) with DHCS.  Form 6153 required the provider to certify under penalty of perjury that (1) "all claims for services submitted electronically have been personally provided to the patient";  (2) "[t]he services were medically indicated and necessary to the health of the patient"; and (3) "all information submitted electronically is accurate and complete."  By signing Form 6153, the Provider (1) "understands that payment of [Medi-Cal] claims will be from federal and/or state funds, and that any falsification or concealment of a material fact may be prosecuted under federal and/or state laws"; (2) "agrees to retain personal responsibility for the development, transcription, data entry, and transmittal of all claim information for payment"; and (3) assume[s] personal responsibility for verification of submitted claims with source documents."

24.     The Medi-Cal Provider Agreement (Form DHCS 9098 (6/10)), similarly required the provider to agree to "comply with all federal laws governing and regulating Medicaid providers," and that "it may be subject to temporary suspension" if it is under investigation for fraud or abuse of the Medi-Cal program "or other health care programs operated, or financed in whole or in part, by the Federal Government."

25.     As a final condition of participation and payment, Medicare providers must execute a Medicare Electronic Data Interchange ("EDI") Enrollment Form in order to submit claims electronically.  The EDI Form requires providers to agree to "be responsible for all Medicare claims

UNITED STATES' COMPLAINT

1  submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate,

2  complete and truthful."  By executing the EDI Enrollment Form, a provider acknowledges that "all

3  claims will be paid from Federal funds, that the submission of such claims is a claim for payment under

4  the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or

5  falsified any record or other information relating to that claim as required by this Agreement may, upon

6  conviction be subject to a fine and/or imprisonment under applicable Federal law."

7  **C.    Nursing Facility Services Under Medicare And Medicaid**

8          26.     Medicare Part A and Medicaid authorize payment for institutional care, including care in

9  facilities licensed by the states.  42 U.S.C. 42 U.S.C. §§ 1395c-1395i-5.

10         27.     The Nursing Home Reform Act ("NHRA") of 1987, 42 U.S.C. § 1395i-3, 1396r *et seq.,*

11 defines a nursing home (a "skilled nursing facility" under Medicare and "nursing facility" under

12 Medicaid, jointly referred to as "facilities") as an institution that is primarily engaged in providing

13 skilled nursing and rehabilitation services above the level of room and board to Medicare and Medicaid

14 beneficiaries who require such services on an inpatient basis, and that is not primarily for the care and

15 treatment of mental diseases.  42 U.S.C. § 1396r(a).

16         28.     Among other requirements, the NHRA mandates that facilities participating in Medicare

17 or Medicaid operate in compliance with all federal and state standards applicable to the provision of

18 skilled nursing services.  42 U.S.C. §§ 1395i-3(b)(4)(A), 1395r(b)(4)(A); 42 U.S.C. §§ 1396r(b),

19 1396r(d)(4)(A).  Among other requirements, facilities must ensure that all services billed to the

20 government are "of a quality which meets professionally recognized standards of health care," and

21 which "attain or maintain the highest practicable physical, mental and psychosocial well-being of each

22 resident in accordance with a plan of care which . . . describes the medical, nursing, and psychosocial

23 needs of the resident and how such needs will be met."  42 U.S.C. §§ 1320c-5(a)(2), 1395i-3(b)(2); 42

24 U.S.C. §§ 1396r(b)(2), 1396r(d)(4)(A); 42 C.F.R. §§ 483.15, 483.25.

25

26 UNITED STATES' COMPLAINT

27                                                          8

28

29.     The CMS regulations implementing the NHRA impose numerous quality care requirements, including 24-hour nursing staff which is sufficient to meet the nursing needs of the residents, maintenance of complete and accurate clinical records, avoidance of medication errors, acceptable nutrition, proper treatment of pressure sores and urinary incontinence, and provision of adequate supervision and assistance devices to prevent accidents.  42 C.F.R. §§ 483.30, 483.13(a), 483.25, 483.60, 483.75.

30.     In particular, the regulations require that nursing home residents be free of unnecessary drugs.  An unnecessary drug is any drug when used in excessive dose, for excessive duration, without adequate monitoring, or adequate indications for its use, and/or in the presence of adverse consequences.  The regulations also require the residents to be free from any physical or chemical restraints used for convenience or discipline.  Moreover, drug regimens must be free from medication errors.  42 C.F.R. §§ 483.25(l)-(m).

31.     Furthermore, a nursing facility must ensure that residents "who have not used antipsychotic drugs are not given these drugs unless antipsychotic drug therapy is necessary to treat a specific condition as diagnosed and documented in the clinical records; and residents who use antipsychotic drugs receive gradual dose reductions, and behavioral interventions, unless clinically contraindicated, in an effort to discontinue these drugs."  42 C.F.R. § 483.25(l)(2).

32.     Compliance with the foregoing laws and regulations is a condition of participation in the Medicare and Medicaid programs.  42 C.F.R. § 483.1(b); CMS State Operations Manual Chapter 7, Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, § 7300.  Compliance with those requirements is determined through survey inspections that are conducted at least on an annual basis or more frequently, as when there are complaints or other triggering events.  42 U.S.C. §§ 1396i-3(g)(1)(A), 1396r(g)(1)(A).  CDPH is responsible for surveying facilities in California on behalf of CMS.  42 U.S.C. §§ 1395aa.

UNITED STATES' COMPLAINT

33.     The "Plan of Correction" ("POC") is the facility's certification of compliance and, without it, CMS and/or the State have no basis on which to verify compliance with the regulations. CMS State Operations Manual Chapter 7, Survey and Enforcement Process for Skilled Nursing Facilities and Nursing Facilities, § 7304.4.

34.     The NHRA authorizes CMS to impose monetary and nonmonetary sanctions, and deny payments, when the facility receives a deficiency citation.  42 U.S.C. §§ 1395i-3(h)(2)(B)(I), 1395i-3(h)(2)(D).  If a facility remains out of compliance within three months of issuance of the deficiency, the Secretary *must* deny payment for new residents.  42 U.S.C. § 1395i-3(h)(2)(D).

## D.     The Medicare and Medi-Cal Payment System

35.     Under Medicare, nursing homes are paid on a per diem basis under a prospective payment system for a "bundle of services" provided to a resident.  Under this system, skilled nursing facilities receive periodic *per diem* payments that cover all costs of furnishing covered services (routine, ancillary, and capital-related costs), other than costs associated with approved educational activities and bad debts and costs associated with a  certain limited number of items and services described in the statute.  42 U.S.C. § 1395yy(e)(1)-(2).  The payments are made "not less often than monthly," prior to audit, and prior to furnishing services to beneficiaries.  42 U.S.C. § 1395g.  CMS relies on the providers' assessments of the residents' condition and needs, as explained below, in order to calculate the prospective payments due.

36.     CMS administers the prospective payment system through contracts with "fiscal intermediaries" or "Medicare administrative contractors" (collectively, "Medicare Contractors").  42 U.S.C. § 1395h; 71 Fed. Reg. 67960, 68181 (Nov. 24, 2007).  Medicare Contractors act on behalf of CMS.  42 C.F.R.  § 421.5(b).

37.     Medicare Contractors calculate the per resident *per diem* rate based in principal part on what the nursing facility reports on the "Minimum Data Set" ("MDS") form for the resident.  42 C.F.R. §§ 483.343, 483.20, 483.315(h)(1)(v); 483.15.  The MDS is a resident assessment tool, and must be

UNITED STATES' COMPLAINT

completed for each resident upon admission to the facility and then periodically thereafter, and transmitted to the Medicare Contractor.  The MDS must accurately state each resident's functional capabilities, medical condition and mental status.

38.     At all times relevant herein, the MDS contained the following certification: "I understand that this information is used as basis for ensuring that residents receive appropriate in quality of care, and as a basis for payments from Federal funds.  I further understand that payment of such Federal funds and continued participation in the government-funded health care programs is conditioned on the accuracy and truthfulness of this information, and that I may be personally subject to or made subject my organization to substantial criminal, civil, and/or administrative penalties for submitting false information.  I also certify that I am authorized to submit this information by this facility on its behalf."

39.     Like Medicare, Medi-Cal also reimburses facilities on a *per diem* basis using "a facility-specific rate setting system . . .  that reflects the cost and staffing levels associated with quality of care for residents in facilities"  California Welfare and Institutions Code Section 14126.02(b).  Facilities submit claims for payment using Form LTC 25-1.

40.     In addition to the MDS Form used to calculate prospective *per diem* rates, facilities are required to submit annual cost reports to CMS, where they report actual costs incurred during the year for services provided to beneficiaries.  At all relevant times herein, a responsible official of the Facility was required to certify in the Medicare cost reports: "to the best of my knowledge and belief, this report and statement are true, correct, complete . . . I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."  The certification also acknowledges that "misrepresentation or falsification of any information contained in the cost report may be punishable by criminal, civil or administrative action, fine and/or imprisonment under federal law."

41.     Similarly, facilities are required to submit annual cost reports to Medi-Cal.  At all relevant times herein, a responsible official of the Facilities was required to and did certify in the Medi-

UNITED STATES' COMPLAINT

11

Cal cost reports "that to the best of his or her knowledge and information he or she believes each statement and amount in the submitted reports to be true and in compliance with Section 14161 of the California Welfare and Institutions Code and/or Section 51511.2 of Title 22 of the California Code of Regulations Section 51511.2 Title 22, California Administrative Code."

42.     Finally, at the end of each fiscal or "reporting year" after submission of the cost report, Medicare and Medi-Cal conduct an audit of the facilities cost report.  42 C.F.R. § 405.1803(a); 22 Cal. Code of Regs. § 52516(a).

## FACTUAL ALLEGATIONS

### A.     Defendants' Operation of the Facilities

43.     Pursuant to the Facilities Consulting Agreements between Health Services and both CFWE and CFWW, Health Services provided "consultative supervision" with respect to the hiring, supervision and payroll of Facility employees, maintenance and repair of the Facilities' physical plant, payment of operating expenses, and "presenting claims under the Licensee's provider agreements."  As compensation for its consulting services, Health Services received 4.25% of the Facilities' gross revenues, payable monthly.

44.     CFWE and CFWW employed all Facility staff, paid their salaries, and maintained close control and oversight over management of the Facilities.  According to the consulting agreements, although Health Services was retained to "use its best efforts to engender the highest and best standard of patient care," CFWE and CFWW remained "fully liable and legally accountable at all times to all patients and governmental organizations for all patient care and funds, and all other aspects of the operations and maintenance" of the Facilities.

45.     CFWE and CFWW entered into the Medicare and Medi-Cal provider agreements and executed most financial transactions involving Medicare and Medi-Cal.  At all times relevant herein, Noridian Healthcare Solutions LLC, and Palmetto GBA, were the Medicare Contractors who deposited

UNITED STATES' COMPLAINT

1    Medicare payments to the Facilities directly into bank accounts held by CFWE and CFWW.  The MDS

2    Forms and cost reports were signed by Health Services on behalf of CFWE and CFWW.

3         46.    Identifying themselves as officers of ARBA, Scott Krieger, the COO of ARBA, and

4    Mark Lazar, Director of Asset Development for ARBA, closely monitored the Facilities' performance

5    through reports and regular e-mail communications.  Among other issues, they communicated directly

6    with Health Services about the financial aspects of the Facilities, census at the Facilities, lawsuits filed

7    against the Facilities, complaint investigations conducted by the CDPH, CMS regulations, government

8    survey materials and the medication failures and problems with pharmacy services at the Facilities.

9    Rachel Bennett, COO of Health Services, attended ARBA meetings and communicated directly with

10   ARBA officials, including Scott Krieger, Ira Smedra, Jacob Wintner, and Mark Lazar.

11        47.    From in or about 2007 through 2012, Defendants received aggregate payments from the

12   Medicare and Medi-Cal programs of more than twenty million dollars ($20,000,000) for services to

13   Medicare and Medi-Cal beneficiaries.

14        48.    Despite their obligations under the NHRA, during the time relevant here, Defendants

15   submitted or caused the submission of claims to the Medicare and Medi-Cal for non-existent, grossly

16   inadequate, materially substandard, and/or worthless services to their Residents.  For example, and as

17   described further below, Residents at the Facilities received narcotics, psychotropics, antipsychotics,

18   hypnotics and anti-anxiety drugs to treat conditions associated with aging, such as dementia, depression

19   and pain.  Thus, Residents became victims of chemical restraints for the convenience of management.

20   The Facilities failed to maintain adequate medication administration records or monitor medication side

21   effects, and administered drugs for excessive duration, without evidence of medical necessity or

22   evidence of clinical medical need, or in the presence of serious adverse consequences.

23   //

24   //

25

26   UNITED STATES' COMPLAINT

27                                            13

28

**B.      CMS Survey Findings and State Complaints**

49.      During the period at issue, CDPH surveyed the Facilities or investigated complaints filed by residents or their families on several occasions.  At those surveys or complaint investigations, CDPH cited the Facilities for numerous quality of care failures that related to or resulted from overmedication or other medication administration failures.

50.      By way of example only, CFWW received citations on the following occasions related to medication failures:

(a)      A September 18, 2007 complaint investigation found that a resident who suffered falls was administered Ativan 2 mg and Seroquel 100 mg without a physician's order.  The Facility did not document the resident's confusion, history of falls or medication orders, nor did it use the results of the assessment to develop, review and revise the resident's care plan to prevent further falls.  In its POC, the Facility represented, among other things, that it would cure the deficiencies by providing appropriate training to its nursing staff, but the deficiencies were not cured, and in fact continued to recur.

(b)      A February 28, 2008 complaint investigation found that a resident was placed on Vicodin and a Duragesic Patch without adequate indications for their use and without care plans for pain and to monitor the side effects of a Duragesic Patch.  The Facility failed to follow Plan Assessment and Management policy when medicating the Resident for pain.  In its POC, the Facility again represented that it would that it would cure the deficiencies by providing appropriate training to its nursing staff, but the deficiencies were not cured, and in fact continued to recur.

(c)      A June 5, 2008 annual recertification survey found that medications were not delivered as prescribed for two residents.  The Facility failed to ensure that drug regimens were free from unnecessary drugs: one resident with a known sulfa allergy received Celebrex, which contains sulfa; another received a Lidoderm patch for a longer time than the manufacturer's

UNITED STATES' COMPLAINT

recommendations.  The Facility failed to address the use of multiple medications with acetaminophen as the main ingredient, failed to follow up on recommendations made by the Facility pharmacist, and failed to ensure that drugs were dated when opened in accordance with the Facility's policies and procedures.  Medication syringes were not cleaned after being used.  Again, in its POC, the Facility represented that all these problems would be corrected, but they were not corrected, and in fact continued to recur.

(d)     A May 4, 2009 annual recertification survey found that the Facility failed to ensure that a Resident was assessed for shortness of breath and pain prior to and after being medicated with sulfate – a narcotic that can decrease the respiratory rate.  The Facility failed to ensure that drug regimens were reviewed to ensure that the benefits of the medication outweighed the risks in cases of mood altering medications; it also failed to maintain a system of medication records that reflected the accurate reconciliation and accounting of all controlled drug medications.  Several medical records showed inconsistent documentation between the medication administration record, the controlled drug sheet and the resident record.  In its POC, the Facility continued to represent that it would cure the deficiencies, but the deficiencies were not cured, and in fact continued to recur.

(e)     A November 2, 2009 complaint investigation found that a physician's order for Ativan was not carried out as ordered, and that an antipsychotic drug was administered without documented evidence of adequate and consistent monitoring of potential adverse consequences.

(f)     An April 22, 2010 survey found that the Facility had a medication error rate of 10.8%.  Among other cases, the Facility failed to notify a physician concerning a resident's behavior of spitting out medications; the Medication Administration Record ("MAR") indicated that lab tests were done but the test results were not in the resident's clinical chart; the Facility failed to develop a care plan for safety during an episode of seizure, and pain medication orders did not have parameters for usage according to the severity of pain; the Facility failed to ensure that an

UNITED STATES' COMPLAINT

anti-diabetic medication was dosed appropriately and with meals in accordance with the manufacturer's instructions; the Facility failed to evaluate and assess the appropriateness of using a fentanyl patch in accordance with the manufacturer's instructions and the FDA's black box warning; a resident was given 11 medications with no food or drink even though they should be administered with food; the Facility failed to ensure medication refrigerators containing vaccines, insulin, Procrit, and other medications were stored under proper temperature controls. In its POC, the Facility again represented that it would cure the deficiencies by providing appropriate training to its nursing staff, but the deficiencies were not cured, and in fact continued to recur.

(g)     A June 20, 2011 recertification survey found that the Facility failed to report a Resident's increasing headaches and to inquire of the treating physician if the headaches could be a side effect of his antidepressant medication.  Another resident did not have a care plan for Methadone (a pain medication) or potassium (an electrolyte), and the Facility failed to clarify the physician's medication order.  Yet another resident with orders for Tylenol and Norco (a pain medication containing Tylenol) for headaches received Remeron (an antidepressant medication), which could exacerbate the headaches, without adequate monitoring for side effects.

51.     Examples of similar adverse survey and complaint investigation findings at CFWE include, among others:

(a)     A July 19, 2007 complaint investigation found that CFWE failed to notify a physician when his patient became lethargic and unable to take his medications, leading to the development of untreated pressure sores.  The Facility failed to ensure that a resident maintained an adequate fluid intake to prevent dehydration caused by medications.  When the resident was transferred to the acute care hospital, the emergency room physician diagnosed him with severe dehydration.  The Facility failed to follow a physician's order regarding the application of a Nitroglycerin ointment to a resident.  In its POC, the Facility represented that the deficiencies

would be cured by ensuring that physicians would be notified of a Resident's change of condition.  The deficiencies in fact continued to recur.

(b)     A June 5, 2008 annual recertification survey found that the Facility failed to ensure that the interdisciplinary team determined it was safe for a resident to self-administer drugs.  The Facility failed to ensure that drug irregularities for several residents were reviewed monthly by a licensed pharmacist and reported to the attending physician.  There was no documented evidence that the pharmacist had reviewed and reported black box warnings on medications administered to several residents.  The Facility failed to ensure that Residents' medication regimens were free from unnecessary drugs.  One resident was on sleeping medications in excessive dose and excessive duration.  Another was on two anti-gastroesophageal reflux medications, while a third was on duplicate antidepressant, both without risk versus benefit analysis.  Two residents were on Fentanyl patches without monitoring for clinically significant adverse effects.  A resident was on a sleeping medication in an excessive dose without adequate indication for use.

(c)     An August 6, 2008 recertification survey found that the Facility failed to check a physician's order for Haldol (an antipsychotic medication) in an excessive dose without an indication for its use.

(d)     A May 1, 2009 recertification survey found that the Facility had a medication error rate of 7.3%, in excess of the regulatory maximum of 5%.  In its POC, the Facility represented that the medication errors would be reduced or eliminated through nurse training and a skills test for administering medications, but the training and skills test, if it ever occurred, did not substantially reduce or eliminate the medication errors, which continued to recur.

(e)     A November 2, 2009 complaint investigation found that Facility failed to correctly transcribe a resident's medication order into the MAR.  The Facility continued initialing/signing the incorrectly transcribed order, resulting in overmedication without an indication for use and adequate behavior monitoring.  The Facility failed to ensure that Haldol given to a Resident

UNITED STATES' COMPLAINT

included an indication for use and failed to question the order as possibly excessive Haldol dosing.  The Facility's medication regimen review failed to identify and report irregularities to the attending physician and director of nursing.  In its POC, among other things, the Facility represented that these deficiencies would be cured by training nursing staff on policies and procedures for recapping physician orders, but such training, if it ever occurred, did not cure the deficiencies, which continued to recur.

(f)      An April 22, 2010 annual recertification survey found that the Facility failed to do an accurate assessment or to give instructions for antidepressant use.

(g)      A June 24, 2011 annual recertification survey found that the Facility failed to develop and revise comprehensive care plans for residents.  Care plans were not revised for the use of medications.  The Facility administered medications despite the absence of any indication for their use in physician orders.  The Facility failed to ensure that medications were coordinated with the dialysis clinic prior to dialysis or to inform the clinic that the resident had developed a wound infection and was on antibiotics.  A MAR was not signed by the licensed nurse who administered the medication.  In its POC, the Facility represented that these deficiencies would be cured by training its nursing staff on medication orders with emphasis on ensuring that orders include indication for use, but such training, if it ever occurred, did not cure the deficiencies, which continued to recur.

(h)      An October 4, 2011 complaint investigation found that the Facility failed to keep accurate drug administration records.  The MARs did not indicate the date and time of administration, the dosage administered, the intensity of the residents' pain when administered and the residents' subsequent response to the medication.

(i)      An October 25, 2012 complaint investigation found that the Facility failed to ensure that residents were free from unnecessary drugs when pharmacy recommendations for medications which could increase the chances of a fall were not addressed.  In its POC, the Facility

UNITED STATES' COMPLAINT

1    represented that its nurses would notify treating physicians of all pharmacy recommendations

2    and changes in a timely manner, but this policy, if it was implemented, did not cure the

3    deficiencies, which continued to recur.

4        52.    As managers, operators or owners of the Facilities, Defendants received and were aware

5    of the survey findings noted above.

6        **C.   Examples of False or Fraudulent Claims**

7        53.    The following paragraphs set forth only select examples of individual Medicare and

8    Medi-Cal beneficiaries who suffered from the non-existent, grossly inadequate, materially substandard

9    and/or worthless care provided by Defendants, often resulting from overmedication for which

10   Defendants made, or caused to be made, false or fraudulent claims to the Medicare and Medi-Cal

11   programs, and for which they wrongfully received and retained payments.

12       54.    The Complaint does not identify the residents in these examples to protect their privacy

13   and to preserve the confidentiality of their medical information.  The United States will provide the

14   identities of the residents to Defendants upon Defendants' agreement to the entry of an appropriate

15   protective order in this action.  The summaries are based on Defendants' clinical records during the

16   Residents' stay at the Facilities.

17       **Resident #1**

18       55.    Resident #1, an 86-year-old man, was admitted to Country Villa West on July 5, 2009.

19   Until the day of his admission, the Resident had been living at home with his daughters and had clear

20   speech.  He walked into the facility unattended.  In addition to the medications he routinely took at

21   home, on admission the Facility requested physician orders to double his daily Xanax

22   (sedative/hypnotic/muscle relaxant) dose and for two new antipsychotics, Haldol and Risperdal.  The

23   Facility ordered these drugs from the pharmacy, without the consent of the Resident or his family, and

24   without physician authorization for the medication orders.

25

26   UNITED STATES' COMPLAINT

27                                     19

28

56.    The Resident received no drugs for the first two days after his admission, and had only three documented episodes of agitation during that time.  After he was given psychotropics and antipsychotics beginning on July 7, 2009, however, his behaviors began to escalate.  Rather than conduct an assessment, however, the Facility gave him an additional dose of Haldol to control the behavior.  The following day, on July 8, 2009, he was noted sleepy, had an unsteady gait and required staff assistance at all times.

57.    On the third day after his admission, the Resident received an injection of Risperdal Consta, a long acting antipsychotic medication.  Following this injection, his level of functioning declined significantly.  His appetite decreased, he spent most of the day in bed, his ability to swallow medications declined, and staff began to hold some of his medications due to lethargy.  He was sedated to the point of near immobility, was not turned or repositioned, and developed additional pressure ulcers.

58.    By July 10, 2009, the Resident had a fever of 102 degrees, but his physician was not notified.  By the afternoon of July 13, 2009, he was rushed to the acute care hospital emergency room, with symptoms of heart failure, a known side effect of antipsychotics in the elderly.  The hospital found him to have sepsis (a blood infection), lethargy, dehydration, malnutrition, an infected pressure ulcer, additional pressure ulcers, and overall functional decline.

59.    Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #1.  For the few days of his stay at the Facility, Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by Medi-Cal, as were paid approximately $3,000.

**Resident #2**

60.    Resident #2 was a 101-year-old woman admitted to Country Villa West on November 20, 2009.  Before coming to the facility, the Resident had lived at home with her daughter who cared for her.  Her daughter had power of attorney for the Resident and was her authorized decision maker.  She

UNITED STATES' COMPLAINT

20

1  admitted her mother to the Facility under the Medicare Hospice program due to "debility" status and

2  because the Resident was requiring more care at home that the daughter was not able to provide.

3       61.     On the day of admission, the Resident was alert, ate, and received her over-the-counter

4  medications, as her prescription medications were not available from the pharmacy.  The daughter was

5  never advised, however, that Hospice had prescribed the narcotic Morphine for her mother, to be used as

6  needed for severe pain.

7       62.     The Facility administered the first dose of Morphine on the night of her admission, even

8  though the documentation indicated the resident was not in any pain.  In addition to 20mg of Morphine,

9  the Facility administered the following psychotropics and antipsychotics to the Resident: the

10 antipsychotic Zyprexa for "agitation manifested by striking out," the hypnotic sedative Ativan for

11 "moderate anxiety manifested by calling out," the antidepressants Trazodone for insomnia, and

12 antidepressant Paxil for "depression manifested by crying."

13      63.     On the morning following the Resident's admission, the Resident was noted deeply

14 sedated, and did not eat.  That same day, the daughter stopped the nursing staff from giving the resident

15 another dose of Morphine, and asked that it be discontinued.  The nurse informed the daughter that

16 Morphine was being administered by mistake, given every 4 hours instead of as needed.  Nonetheless,

17 that same day the facility continued to administer the Morphine.

18      64.     The Resident soon became unresponsive, and never fully regained consciousness.  On

19 November 22, 2009, just two days after admission, the Resident died at 2:23 pm.

20      65.     Defendants knowingly provided, or caused to be provided, non-existent, grossly

21 inadequate, materially substandard and/or worthless services to Resident #2, and falsely or fraudulently

22 represented or certified, or caused to be represented or certified, that such claims were properly payable

23 by the Medi-Cal program.

24

25

26 UNITED STATES' COMPLAINT

27                                              21

28

66.     Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

67.     For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #2, Defendants knowingly made or caused to be made claims for payment to the Medi-Cal program, and were paid approximately $1,000.

**Resident #3**

68.     Resident #3 was an 86-year-old retired nurse, admitted to Country Villa West on January 30, 2010.  On admission, she could ambulate with a walker or cane, was continent of bowel and bladder and required only limited assistance with most activities of daily living.

69.     Her medical history included dementia, bipolar depression, and fibromyalgia with chronic total body pain.  The nursing staff described her as demanding, yelling and complaining about medication administration.  Clinical records indicate the Facility was unable to handle her psychiatric and pain management issues, but rather than seek appropriate care opted to medicate her.  At the Facility, she was treated with a polypharmacy of multiple psychotropics, antidepressants, and pain medications in excessive amounts.

70.     The Resident suffered several falls: She fell twice in February 2010; in May 2011, she suffered a fall requiring an overnight stay in hospital and repair of a broken ankle.  Her clinical records show that she was no longer able to ambulate, was incontinent of bowel and bladder and totally dependent on the Facility staff for bed mobility, transfers, toileting and grooming.  Her decline in functional status, which continued through 2012, was the result of overmedication of pain and psychotropic drugs without adequate non-pharmaceutical intervention.

71.     Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #3, and falsely or fraudulently

UNITED STATES' COMPLAINT

22

represented or certified, or caused to be represented or certified, that such claims were properly payable by the Medi-Cal program.

72. Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

73. For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #3, Defendants knowingly made or caused to be made claims for payment to the Medicare and Medi-Cal programs, and were paid approximately $205,819.

**Resident #4**

74. When Resident #4 was admitted to Country Villa West on November 25, 2008, she was alert, oriented, and living independently, prior to knee replacement surgery. She was admitted in order to continue rehabilitation therapy for her knee surgery, and return home where she lived with her cat. She was 79 years old.

75. The facility failed to properly administer and monitor narcotics, and administered them in excessive doses and for excessive duration. For the first 17 days of her residency, the Resident received excessive doses of the narcotic Percocet. The medication administration records charted the Resident getting 83 Percocet doses.

76. Percocet was discontinued following 17 days of frequent administration due to vomiting. The Resident was then placed on the narcotic Norco for 28 consecutive days. After these two opioid derivatives were discontinued, another narcotic, Darvocet, was administered.

77. The facility failed to timely initiate interventions to prevent falls, and the Resident continued to receive large quantities of narcotic pain and anti-nausea medications. On December 12, 2008, the Resident fell out of bed at 3:00 a.m. and sustained skin tears.

78. During the seven weeks in the Facility, the Resident lost 26 pounds, or 16.8% of her body weight. She also had acute renal failure and dehydration. After only seven weeks, Resident #4 was

UNITED STATES' COMPLAINT

23

rushed to Watsonville Community hospital, was diagnosed with septic syndrome, aspiration pneumonia and respiratory failure, and died a day later in January 2009.

79.     Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #4, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by the Medicare and Medi-Cal programs.

80.     Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

81.     For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #4, Defendants knowingly made or caused to be made claims for payment to Medicare, and Medi-Cal and were paid approximately $53,957.

**Resident # 5**

82.     Resident #5 was admitted to Country Villa East on April 3, 2008, from Watsonville Community Hospital for treatment of a serious infection to her right foot caused by a diabetes ulcer. She was 46 years old, lived independently with her boyfriend, and had children.  On her physician's recommendation, she came to the Facility expecting to return home in a couple of months.  Four weeks later however, at 5:45 a.m. on May 7, 2008, the Resident was found unresponsive, pulseless and without respirations.

83.     The Santa Cruz County coroner determined her cause of her death to be poisoning of the narcotics "Morphine, Hydrocodone and Fentanyl."  The Facility was charged with administering these drugs to the Resident.

84.     The Resident's medication orders included the narcotic Vicodin, Phenergan to combat nausea associated with narcotics, and a Fentanyl patch (a potent narcotic).  The substances in Fentanyl include methadone, Morphine, and oxycodone.  Fentanyl has the highest potential risk of fatal overdose

due to respiratory depression.  Phenergan has the potential to make narcotics more powerful.  Side effects of all these drugs include abnormal nervous system function, difficulty breathing, fast heartbeat, irregular pulse, dizziness, drowsiness, and potential dependency and overdose.

85.     Defendants were required to assess and monitor the Resident for the presence of these dangerous side effects.  However, the Resident's medication records show that the Facility failed to consistently assess the Resident for side effects or symptoms of overdose, or to properly manage her pain resulting in frequent and serious medication errors.  Despite multiple control drug orders, and emergent hospitalizations, the Resident was not examined or assessed by her physician until on April 28, 2008, 25 days after admission.

86.     On April 17, 2008, the Resident was noted to have an altered level of consciousness and suffered from confusion.  She became unresponsive and was rushed to the emergency room hospital. The clinical records on this date shows that a Fentanyl patch had been administered on April 15, 2008, and another on April 16, 2008.

87.     Medication records show that on May 7, within the 24 hours prior to her death, the Resident received at least 10 Vicodin tablets in addition to 4 doses of Phenergan, and reapplication of the Fentanyl patch.  Yet, the Resident had not been monitored since 9:00 p.m. on May 6.  In addition, a note on the Nurses Medication Notes shows that two Vicodin were given at 5:30 a.m. on the morning of her death.  Due to the administration of excessive doses of Vicodin, at times the Resident received toxic levels of Tylenol, a component of Vicodin.

88.     Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #5, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by the Medi-Cal program.

UNITED STATES' COMPLAINT

89.     Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

90.     For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #5, Defendants knowingly made or caused to be made claims for payment to Medicare, and Medi-Cal and were paid approximately $20,790.

**Resident #6**

91.     Resident #6 was 71-year-old man who was admitted to Country Villa East on September 1, 2009 with multiple diagnoses, including Parkinson's, muscle weakness, and persistent mental disorders.

92.     The Resident was soon given multiple psychotropic medications without monitoring or documentation of their dangerous side effects.  The medications included Seroquel (an antipsychotic), Ativan (an anti-anxiety drug), Depakote (an anticonvulsant), Remeron (an antidepressant), Restoril (a hypnotic), Vicodin (pain medication) and Ultram (a narcotic-like pain reliever).  Common and well-known side effects of these drugs include urinary retention, postural hypotension (drop in blood pressure due to change in body position), unsteady gait, sedation, dizziness, irregular heartbeat, trouble breathing, mental impairment, depression, among others.

93.     Resident suffered from severe side effects of the medications he was given, resulting in at least 21 falls or injuries and at least 18 urinary and upper respiratory infections within a two-year period. He suffered a significant decline at the Facility, due to worsening infections, the development of pressure ulcers and the need of a Foley catheter to help him urinate.  He was taken to the hospital emergency room multiple times in 2011, and in June 2011, Watsonville Community Hospital filed a complaint of neglect against Country Villa East with the California State Long-Term Care Ombudsman. The Resident returned to the Facility and resided there in 2012.

UNITED STATES' COMPLAINT

94.    Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #6, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by the Medi-Cal program.

95.    Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

96.    For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #6, Defendants knowingly made or caused to be made claims for payment to Medicare and Medi-Cal, and were paid approximately $115,147.

**Resident #7**

97.    Resident # 7 was a 91-year-old woman who was admitted to Country Villa East on October 5, 2008.  Almost immediately, the Facility increased her antianxiety and antipsychotic medications, and added an antidepressant.  Within little more than a week of her admission, the Resident had suffered two falls, one from her wheelchair with head trauma, and she was unable to sit upright.

98.    On October 17, 2008, the Resident suffered yet another fall from her wheelchair and was sent to the hospital emergency room where she was diagnosed with an intracerebral hemorrhage.  She was returned to the Facility with orders to hold any sedative type medications.  However, five days later she was administered several contra-indicated drugs, including the antipsychotic Risperdal, the antianxiety drug Ativan, and Ambien for insomnia.  All these medications continued until December 26, 2008, when the Resident suffered yet another acute intracerebral hemorrhage and had to be rushed to the emergency room.

99.    On return to the Facility December 26, 2008, the Resident suffered a terminal stroke, and was put on Hospice.  For the next week, until her death on January 6, 2009, the Resident received daily liquid Morphine despite no signs or symptoms of pain.

UNITED STATES' COMPLAINT

100.     Defendants knowingly provided, or caused to be provided, non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #7, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable by the Medi-Cal program.

101.     Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the government, and falsely or fraudulently represented or certified, or caused to be represented or certified, that such claims were properly payable.

102.     For such non-existent, grossly inadequate, materially substandard and/or worthless services to Resident #7, Defendants knowingly made or caused to be made claims for payment to Medi-Cal, and were paid approximately $16,000.

**Resident #8**

103.     On admission to Country Villa West in March 2009, this 81-year-old Resident was documented to be alert, cooperative, full weight bearing, ambulating three times a day with physical therapy and up in a chair twice a day.  He required one-person assistance with most activities of daily living, had a good appetite, and used a hearing aid and a walker as assistive devices.  He received physical therapy and occupational therapy and went for weekly dialysis on an outpatient basis for his end stage renal disease.

104.     While at the Facility, he was administered various doses of Ativan, but there was no documentation regarding the reason the drug was administered.  He was also administered various doses of the narcotic Morphine, but there was no documentation regarding the reason it was administered, and there was no documentation of pain or of the monitoring of pain.  On the contrary, the records indicate the Resident had no current or recent pain diagnosis.  There was no adequate documentation of the Resident's status regarding his respirations, vital signs, and alertness, before and after the administration of Morphine, as required by the standard of care.  He received the antidepressant Lexapro, but there was

UNITED STATES' COMPLAINT

1    no documentation regarding issues of depression.  In fact, the Facility documentation indicated the

2    Resident's lungs were clear, his skin intact, was continent of bowel and bladder.

3         105.    The Resident was put on Hospice on April 26, 2010.  The physician progress notes and

4    order were lacking or were without signature.  One of the orders was not faxed to the physician for

5    signature until April 27, 2010, the day after the Resident's death.

6         106.    Defendants knowingly provided, or caused to be provided, non-existent, grossly

7    inadequate, materially substandard and/or worthless services to Resident #8, and falsely or fraudulently

8    represented or certified, or caused to be represented or certified, that such claims were properly payable

9    by the Medi-Cal program.

10         107.    Defendants submitted MDS forms, Forms LTC 25-1, and other claims for payment to the

11    government, and falsely or fraudulently represented or certified, or caused to be represented or certified,

12    that such claims were properly payable.

13         108.    For such non-existent, grossly inadequate, materially substandard and/or worthless

14    services to Resident #8, Defendants knowingly made or caused to be made claims for payment to

15    Medicare and Medi-Cal, and were paid approximately $47,635.

16         109.    The foregoing are only examples of the non-existent, grossly inadequate, materially

17    substandard/worthless care rendered to Residents at the Facilities, with the knowledge of Defendants,

18    and are only examples of the resulting false or fraudulent claims that Defendants knowingly submitted

19    or caused to be submitted to the Medicare and Medi-Cal programs, and false or fraudulent

20    representations or certifications material to such claims, from 2007 to 2012.  The United States has, and

21    will develop through discovery and further analysis, including expert analysis, additional evidence of

22    Defendants' false or fraudulent claims, representations and certifications, and the United States'

23    resulting damages.

24    //

25    //

26    UNITED STATES' COMPLAINT

27                        29

28

1

**D.      Defendants' Knowledge and False Statements in Support of Claims.**

2    110.    At all times relevant to this Complaint, Defendants were informed of the non-existent,

3    grossly inadequate, materially substandard and/or worthless services furnished at the Facilities.  CFWE,

4    CFWW and ARBA officials all closely monitored and exercised substantial control over the operation of

5    the Facilities in close contact with Health Services.  They received government survey reports and State

6    complaints, and employee and family complaints about the failures of resident care.

7    111.    The Facilities' pharmacist wrote monthly Medication Regimen Review reports

8    concerning egregious medication administration failures that were highly dangerous for Residents.  He

9    also reported regularly to the Facilities' Administrators psychotropic utilization rates as well as specific

10   Residents who were on antipsychotics but did not have an indication for their use.  Defendants at all

11   times relevant to this Complaint knew that the Facilities had persistent medication failures and the

12   detrimental health effects they had on residents.

13   112.    In spite of this knowledge, Defendants represented through MDSs, and cost reports

14   referenced herein, that the deficiencies had been corrected and that the Facilities complied with all

15   conditions of participation and payment.  These representations were false.  Moreover, Defendants

16   falsely certified compliance with the NHRA in cost reports and other claim forms submitted to the

17   government.

18   113.    Through their misrepresentations and concealments in the MDSs, LTC 25-1s, and cost

19   reports, Defendants knowingly submitted, or caused the submission of, false claims to the United States,

20   and knowingly made false records and statements material to the government's decision to pay those

21   claims.

22   //

23   //

24   //

25

26   UNITED STATES' COMPLAINT

27

28

**FIRST CAUSE OF ACTION**

[False Claims Act, 31 U.S.C. § 3729(a)(1) (claims up to and through May 19, 2009)

and 31 U.S.C. § 3729(a)(1)(A) (claims from and after May 20, 2009)]

114.   The United States restates and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

115.   Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Medicare and Medicaid  programs, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1), for claims up to and through May 19, 2009, and in violation of § 3729(a)(1)(A), for claims from and after May 20, 2009.

116.   By virtue of the false or fraudulent claims presented or caused to be presented by Defendants, Defendants are jointly and severally liable to the United States for its damages resulting from such false claims, in an amount to be determined at trial, trebled, plus civil penalties of between $5,500 and $11,000 for each violation.

**SECOND CAUSE OF ACTION**

(False Claims Act, 31 U.S.C. § 3729(a)(1)(B))

117.   The United States restates and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

118.   Defendants knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims, or false records and statements to get false claims paid, by  the Medicare and Medicaid programs, in violation of the False Claims Act, § 3729(a)(1)(B).

119.   Pursuant to the FCA, Defendants are jointly and severally liable to the United States for its damages resulting from such false records and statements, in an amount to be determined at trial, trebled, plus civil penalties of between $5,500 and $11,000 for each violation.

//

//

UNITED STATES' COMPLAINT

31

## THIRD CAUSE OF ACTION

### (Payment by Mistake)

120.    The United States restates and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

121.    This is a claim for the recovery of monies paid by the United States to Defendants as a result of mistaken understandings of fact.

122.    The United States, without knowledge of the falsity of the claims, representations and certifications that Defendants made, or caused to be made, mistakenly paid Defendants certain sums of money to which they were not entitled.

123.    Defendants are liable to account for and pay such amounts to the United States, in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Unjust Enrichment)

124.    The United States restates and incorporates by reference paragraphs 1 through 113 as if fully set forth herein.

125.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched.

126.    Defendants were unjustly enriched with federal monies from the Medicare and Medicaid programs, which Defendants should not in equity and good conscience be permitted to retain, and which Defendants should account for and disgorge to the United States, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, the United States demands and prays that judgment be entered in its favor against Defendants, as follows:

UNITED STATES' COMPLAINT

A.      On the First and Second Causes of Action under the False Claims Act, that judgment be entered against Defendants jointly and severally, in the amount to be determined at trial, trebled, plus civil penalties of $5,500 to $11,000 for each violation;

B.      On the Third and Fourth Causes of Action, that judgment be entered against Defendants jointly and severally, in the amounts to be determined at trial by which Defendants were mistakenly paid and unjustly and unlawfully enriched, plus interest, costs, and expenses, and all such further relief as may be just and proper;

C.      With respect to each Count, that the United States be afforded interest, attorney's fees and costs as allowed by law, and any and all further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, the United States demands a trial by jury on all issues so triable.

Respectfully Submitted,

MELINDA HAAG
United States Attorney

Dated: August 29, 2014                  By: ___/s/ signature on file_____

GIOCONDA MOLINARI
Assistant United States Attorney

UNITED STATES' COMPLAINT

33